IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | No. 3:23cr319 |
| | : | |
| v. | : | (Judge Munley) |
| | : | |
| ADAM MATARESE, | : | |
| Defendant | : | |

## MEMORANDUM

Defendant Adam Matarese stands accused of possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and possession of a firearm by a prohibited person, in violation of 18 U.S.C. § 922(g). (Doc. 1). Before the court is defendant's motion to suppress evidence. (Doc. 66). Following an evidentiary hearing conducted in two parts and the opportunity for the parties to file supplemental briefs, the defendant's motion is ripe for disposition.

With the motion, Matarese seeks to suppress the statements he made during and after his arrest as well as any evidence seized from the motel room where officers took him into custody. (Doc. 66 ¶ 4). In doing so, Matarese contends that law enforcement obtained incriminating oral statements without properly advising him of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (Id. ¶ 2). Defendant also asserts that his Fourth Amendment rights were

violated because the search warrant authorizing the search of the motel room was allegedly procured through misrepresentations made to the issuing judge.[1] (Id. ¶ 3).  That is, in addition to an alleged misrepresentation about Miranda warnings being given, Matarese argues that the search warrant also contains a misrepresentation from an officer that contraband was observed during a "cursory sweep." (Doc. 67, Def. Br. in Supp. at 4–5).

All of the issues raised in the motion ultimately turn on credibility—specifically, whether the court credits Matarese's testimony or the officers' testimony.  Defendant testified that he was under the influence of drugs at the time of the arrest.  If true, that makes his account of events unreliable and compromised by chemical impairment.  The court also has reason to question Matarese's truthfulness based on his incentives to lie, his behavior captured in the bodycam video, and his previous *crimen falsi* convictions.  The court finds that Matarese's testimony at the hearing lacks credibility.

Furthermore, despite extensive efforts by Matarese's counsel to impeach the officers who testified in this case, those efforts fall short.  Contrary to Matarese's contentions, the officers testified credibly and the court finds that they

---

[1] As discussed below, Detective Majikes sought two search warrants, one for the motel room and another for the defendant's vehicle.  Only the motel room search warrant is at issue in this case. Accordingly, unless otherwise noted, all references to the search warrant in this memorandum pertain to the warrant authorizing the search of the motel room.

2

did not create exigent circumstances during the execution of the arrest warrants as defendant submits.  Furthermore, based on credible testimony, an officer read Matarese his <u>Miranda</u> warnings at the time of his arrest once the defendant started talking about a gun in the motel room.  Matarese's conduct following his arrest was voluntary and informed, as were his statements to the police.

Furthermore, Matarese has not put forth a valid basis to suppress the evidence recovered from the motel room.  Any imprecision in the wording of the search warrant application is immaterial.  Likewise, any inconsistencies between the officers' testimony and written reports are minor and attributable to the relay of information during the investigation.  Accordingly, Matarese's motion to suppress will be denied.

**Background**

As of November 30, 2023, law enforcement was actively seeking Adam James Matarese.  The Pennsylvania Department of Corrections had issued an arrest warrant to commit and detain the defendant for an alleged violation of state parole. (Doc. 74-1, Doc. 128-1, Gov. Ex. A. at ECF p. 1).  Additionally, West Hazleton Borough Police had secured a warrant for Matarese's arrest due to alleged manufacture, delivery, or possession with intent to manufacture or deliver controlled substances. (<u>Id.</u> at ECF pp. 2–6).

3

These warrants triggered a considerable investigation and response. Officer Max Fada of the Pennsylvania Department of Corrections, Bureau of Special Operations and of the United States Marshals Service Fugitive Task Force led the investigation to locate and apprehend the defendant. (Doc. 98, Transcript of Suppression Hearing – Part I, 09/23/2025 ("H.T. Part I"), 8:8-18, 10:7-15). Fada developed information that Matarese was staying at hotels in the Wilkes Barre area. (Id., M. Fada Testimony, 17:20-25). On the morning of November 30, 2023, Fada and another Task Force Officer, Christina Zabrovian, went to a Motel 6 in Wilkes-Barre Township. (Id., 18:1-6).

As Officer Fada testified, Officer Zabrovian met with management of the Motel 6 and showed them a picture of the defendant. (Id., 18:7–19:14). Zabrovian then relayed to Fada that management confirmed Matarese was staying in Room 415 at the motel. (Id.) Zabrovian also observed motel surveillance video of Matarese arriving at Motel 6, which management showed her. (Id.) She relayed all such information to Fada. (Id.)

Matarese has an extensive criminal record, including previous drug-related convictions. (Doc. 128-2, Gov. Ex. B). As Fada testified, he observed that the defendant's criminal record included, among other things, resisting arrest, burglary, receiving stolen property, retail theft, and tampering with or fabricating physical evidence. (Doc. 98, H.T. Part I, M. Fada Testimony, 15:20–17:22).

4

According to Officer Fada, he needed additional officers to safely execute the arrest warrants. (Id., 19:15-22). Consequently, he called in other Task Force Members: 1) Pennsylvania State Trooper Daniel Denucci; 2) United States Marshals Service ("USMS") Deputy Marshal Lenahan; 3) USMS Deputy Marshal Hubbard; and 4) Wilkes-Barre Police Department Officer Jeff Ference. (Id., 20:10-19). Ference is a member of the Luzerne County Drug Task Force. (Id., 36-13-18). Ference, in turn, called in Detective John Majikes of the Luzerne County District Attorney's Office and member of the Drug Task Force. (Id., Testimony of J. Majikes, 102:19-23, 105:10-16). The officers then prepared a pre-operations plan by phone and executed the arrest warrants for Room 415.

Seven officers made their way to the fourth floor of the motel. Trooper Denucci operated the ballistic shield. (Id., D. Denucci Testimony, 57:18-23). According to Officer Fada, who was behind Denucci in the line of officers at the door, Matarese answered after multiple knocks with the chain attached to the door. (Id., M. Fada Testimony, 21:6-14). Per Fada, he identified Matarese before the defendant slammed the door shut. (Id.) Immediately following, USMS Deputy Marshal Lenahan kicked the door open. (Id., 38:7-9). Once inside the motel room, officers observed defendant standing between the bathroom and bedroom areas. (Id., D. Denucci Testimony, 58:22-59:4). Officers issued several commands directing Matarese to surrender. (Id., M. Fada Testimony, 23:7-17,

38:17-21). Matarese complied with the officers' commands to get to the floor and crawl toward them. (Id., 22:22–23:14). Officers then arrested defendant near the threshold of the motel room, adjacent to the bathroom while he was on the ground. (Id.) According to officers Fada and Majikes' testimony, they next swept the room—a bedroom and a bathroom—and observed what they believed to be methamphetamine shards on the toilet. (Id., M. Fada Testimony, 23:15–24:16; see also id., J. Majikes Testimony, 108:5-16). As this was occurring, Matarese was taken from the room into the hallway in handcuffs. (Id., 39:5-11).

Trooper Denucci remained in the hallway with the defendant. (Id., D. Denucci Testimony, 60:7-12). According to Denucci, the defendant "indicated that he wanted to talk to an officer, in an attempt to help himself out, and disclosed…that there was a firearm in the room." (Id., 60:17-23). Matarese did so without prompting, per Denucci's testimony. (Id., 60:24–61:1).

Denucci further testified that, at this point, he read the defendant his Miranda rights. (Id., 61:6-13, 61:21–62:9). He also told the defendant that he would get a different officer, who handled "these types of investigations more commonly[,]" i.e., a Drug Task Force Officer, Officer Ference. (Id., 62:8-15). Per Denucci, Officer Ference was still inside the room securing it, while members of law enforcement waited for a search warrant. (Id., 62:16-20). Officer Ference testified that his cohort from the Luzerne County Drug Task Force, Detective

6

Majikes, had departed the scene to work on the search warrant after Matarese was arrested. (Id., J. Ference Testimony, 85:18-21).

According to Officer Ference, Trooper Denucci came into the room from the hallway and said to Ference that the defendant wanted to provide information. (Id., 86:17–87:3). Ference then activated his bodyworn camera ("BWC" or "bodycam") and went to speak with the defendant. (Id., 87:4-6). The conversation between Denucci and Ference is captured on video, but not on audio, due to the way the bodycam records footage prior to being manually activated. Officer Ference and Matarese's conversation is detailed later in this memorandum. According to Ference, he relayed details of this conversation to Detective Majikes for the search warrant application. (Id., 95:6-24).

Some of Matarese's arguments in support of suppression focus on the details of Detective Majikes's affidavit of probable case. (See Doc. 128-3, Gov. Ex. D.). Majikes's affidavit indicates that there was a "cursory sweep" of the motel room and that Matarese was read his Miranda warnings on video. (Id.) In essence, Majikes testified that, after leaving the scene, and going to his office, he relied on information provided by other officers while applying for a search warrant for the motel room. (Doc. 98, H.T. Part I, J. Majikes Testimony, 115:4–116:4).

Ultimately, a search warrant was approved by Magisterial District Court Judge Thomas F. Malloy, and officers, in executing the warrant, then located a firearm, crystal methamphetamine, and cash in Matarese's motel room, per Majikes's testimony. (Id. 116:15–117:1).

Matarese also provided brief testimony during the suppression hearing.  He stated that the officers did not read him Miranda warnings. (Doc. 98, H.T. Part I, A. Matarese Testimony, 125:22–126:3).  On cross-examination, the government impeached the testimony.  Specifically, on cross, Matarese testified as follows:

> Q. My first question, Mr. Matarese, is, do you recall making that statement to TFO Ference about five ounces of ice being in your room?
>
> A. I can't recall the amount, but as I look at it, I could say that I see what I said.
>
> Q. Is your statement on this video made to Officer Ference true?  Did you, in fact, have five ounces of methamphetamine in your hotel room?
>
> A. I was high, I don't know what I said, sir.

(Id., 131:3-11).

Matarese was also cross-examined about his various prior convictions, including crimes of dishonesty—burglary, unauthorized use of an automobile, tampering or fabricating physical evidence—which the defendant acknowledged. (Id., 131:25–133:7).

8

**Legal Standard**

With respect to Matarese's challenges to the execution of the arrest warrants and to the subsequent search warrant, the Fourth Amendment guarantees that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

Turning to Matarese's Miranda-related arguments, the Fifth Amendment to the United States Constitution provides, among other things, that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. AMEND. V.  The privilege provided by the Self-Incrimination Clause "protects individuals not only from legal compulsion to testify in a criminal courtroom but also from 'informal compulsion exerted by law enforcement officers during in-custody questioning.' " Pennsylvania v. Muniz, 496 U.S. 582, 589 (1990) (quoting Miranda, 384 U.S. at 461)).

To give force to this protection from compelled self-incrimination, Miranda established procedural safeguards requiring police to advise criminal suspects of their rights before commencing custodial interrogation, i.e., what are commonly called Miranda warnings. See Florida. v. Powell, 559 U.S. 50, 59–60 (2010).

9

Specifically, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Miranda, 384 U.S. at 444.

The Supreme Court has further described Miranda warnings as "a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." Maryland v. Shatzer, 559 U.S. 98, 103 (2010) (quoting Miranda, 384 U.S. at 467)). "Unless a suspect 'voluntarily, knowingly and intelligently' waives these rights ... any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in a subsequent criminal proceeding." Muniz, 496 U.S. at 589 (quoting Miranda, 384 U.S. at 444)). Incriminating responses include both inculpatory and exculpatory responses that the prosecution may seek to introduce at trial. Rhode Island v. Innis, 446 U.S. 291, 301 n.5 (1980). "[T]he determination whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." United States v. Mesa, 638 F.2d 582, 584 (3d Cir. 1980). "A defendant's statements made in the course of a custodial interrogation are not admissible as evidence unless the defendant received appropriate warnings, or an exception applies." United States v. Leese, 176 F.3d 740, 743 (3d Cir. 1999).

The applicable burden of proof on a suppression motion begins with the defendant, who must establish a factual basis for suppression. United States v. Voigt, 89 F.3d 1050, 1067 (3d Cir. 1996).  Once the defendant makes that showing, the burden rests upon the government to prove, by a preponderance of the evidence, that the challenged evidence is admissible. See United States v. Matlock, 415 U.S. 164, 177 (1974).

If the government cannot meet its burden, the exclusionary rule bars the admission of evidence obtained from a search or seizure in violation of the Constitution as well as evidence derivatively acquired therefrom under the fruit of the poisonous tree doctrine. Herring v. United States, 555 U.S. 135, 139 (2009); United States v. Smith, 575 F. Supp. 3d 542, 550 (E.D. Pa. 2021).

**Analysis**

Defendant moves to suppress the evidence recovered in this case on three grounds.  First, defendant contends that his arrest and the subsequent recovery of methamphetamine, a firearm, and other evidence were predicated on a warrantless entry into his motel room.  Second, Matarese argues that the search warrant authorizing the search of the motel room was invalid because it contained materially false statements, including allegations that defendant was advised of his Miranda rights on video and that officers observed additional indicia of criminal activity during a "cursory sweep" of the motel room.  Lastly,

defendant asserts that his admission that approximately five ounces of methamphetamine were located inside the motel room was obtained without advisement of his rights under Miranda v. Arizona. (Doc. 67, at 3-5).

**1. Whether Entry into Motel Room Violated Matarese's Rights**

Matarese argues that the evidence recovered in this case should be suppressed because the officers' initial entry into his motel room was "warrantless." (Doc. 67, Br. in Supp. at 3).  According to Matarese, the agents could have easily taken him into custody when they first identified him in the motel parking lot. (Id. at 3).  Matarese contends that no legitimate exigency or other recognized exception justified the warrantless entry into the motel room. The defendant's argument, which turns on the officers' credibility, is unpersuasive.

*Officers' Credibility* – An area of testimonial divergence in this case concerns how officers gained entry to Matarese's motel room.  "At a hearing on a motion to suppress, it is well-settled that 'the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge.' " United States v. Martin, 618 F. Supp. 3d 205, 209–10 (W.D. Pa. 2022) (quoting United States v. Richardson, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007)). "The court, as finder of fact, is free to accept or reject any or all of a

12

witness's testimony." United States v. Murphy, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted). "Credibility determinations are to be made in consideration of numerous factors." Id.  In making credibility determinations, courts consider several factors, including a witness's demeanor, ability to recall events, possible bias, or interest in the outcome, whether the testimony is consistent with other evidence, and whether it withstands common sense and logic. Id.

At the same time, testimony is not entitled to greater or lesser weight simply because the witness is a law enforcement officer. See, e.g. United States v. Bethancourt, 65 F.3d 1074, 1080 (3d Cir.1995) (viewing favorably the use of a jury instruction advising that the testimony of a law enforcement officer is not entitled to any greater or lesser weight than that of any other witness); see also United States v. Conley, 859 F. Supp. 830, 840 (W.D. Pa. 1994) ("Government witnesses are not per se credible, or even presumed to be credible.").

Officer Fada testified that, after Matarese opened the door with the chain latch engaged and then slammed it shut, Deputy Lenahan decided to breach the door and successfully kicked it open. (Doc. 98, H.T. Part I, M. Fada Testimony, 21:8-25, 38:8-9).  Officer Denucci testified that officers gave verbal commands to Matarese, presumably directing him to surrender, after which defendant retreated inside and the door was eventually breached. (Id., D. Denucci Testimony, 58:16-

19).  Officer Ference provided fewer details, testifying only that officers gained entry into the motel room. (Id., J. Ference Testimony, 84:19-21).   Detective Majikes testified that he was present that day and was the last officer "in the stack" during the entry into the motel room. (Id., J. Majikes Testimony, 105:15-16, 106:6-7, 107:1-2).  He further testified that he never "put eyes" on Matarese prior to going into the motel room that day. (Id., 106:10-11).

The court also carefully reviewed Officer Ference's bodycam footage.  In the footage, after exiting the motel room in the hallway, Officer Ference is heard telling Matarese "now that you're not slamming the door in our face three times." (Doc. 75, Ex. B., Ference BWC, 0:34-0:45).  The footage also captures portions of a conversation among Officer Zabrovian, Officer Denucci, and Deputy Marshall Hubbard regarding a "keycard." (Id., 1:00-1:25).  Officer Zabrovian can be heard saying "keycard," and Deputy Marshall Hubbard is seen passing an object resembling a motel keycard to Zabrovian. (Id.)

Additionally, Detective Majikes noted in his affidavit of probable cause that "officers approached the door to room 415 and knocked and used a ruse . . . Matarese opened the door to room 415. Matarese immediately slammed the door and latched it once he saw it was the police. Officers then forced the door open [.]" (Doc. 74-2, Warrant App. at 4).

14

Although the officers described the entry in somewhat different ways, their testimony was consistent in all material respects, specifically that the officers forcibly entered the motel room after Matarese shut the door on them.  To the extent there is any uncertainty regarding whether officers physically breached the motel room door, used a ruse, or whether a keycard was also used during the process, those details are not dispositive and do not undermine the officers' credibility.[2]

The bodycam footage further supports this conclusion.  During the encounter with Officer Ference, Matarese himself stated, "you guys kicked in my door, for what?" (Id., 4:30-4:40).  A battering ram is also visible in the hallway. (Id.)  Accordingly, the court finds the officers' testimony credible and concludes that the officers forcibly breached the motel door once Matarese answered it; and upon seeing law enforcement, he abruptly shut and latched the door.  The

---

[2] Even assuming a ruse was employed, the use of deception alone does not automatically amount to a violation of a defendant's constitutional rights. See, e.g., United States v. Richardson, 501 F. Supp. 2d 724, 738 (W.D. Pa. 2007), adhered to on denial of reconsideration, No. CRIM. 3:2006-31, 2007 WL 2823336 (W.D. Pa. Sept. 26, 2007) ("The ruse was a permissible tool to obtain the Defendant's consent to enter his residence and subsequently search these articles because the ICE agents were obtaining a view of matters that one would view if they were investigating a possible theft of one's identity over the Internet."); see also  United States v. Welles, No. CRIM.A. 96-413-03, 1998 WL 31676, at *5 (E.D. Pa. Jan. 7, 1998), aff'd, 182 F.3d 905 (3d Cir. 1999) ("the defendant's motion to suppress the money seized as a result of a valid car stop, despite one detective's characterization of the stop as a "ruse," will be denied.").

various distinctions raised by the officers' testimony make no difference. This finding is critical with respect to Matarese's other arguments about "warrantless" entry into the motel room.

*Execution of Arrest Warrants* – "[A] guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." Stoner v. State of Cal., 376 U.S. 483, 490 (1964). Nevertheless, officers may enter a dwelling to arrest the subject of an arrest warrant when they have probable cause to believe the subject is inside. Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Agnew, 407 F.3d 193, 196 (3d Cir. 2005); United States v. King, 604 F.3d 125, 137–38 (3d Cir. 2010). "[I]n executing an arrest warrant, officers may constitutionally enter a home [or a motel room] when two conditions are present. The officers must have a "reasonable belief" that (i) "the arrestee resides at the dwelling" and (ii) "the arrestee is present at the time of the entry." United States v. Shaulis, No. 20-2253, 2022 WL 251924, at *2 (3d Cir. Jan. 26, 2022) (quoting United States v. Vasquez-Algarin, 821 F.3d 467, 472 (3d Cir. 2016)).

Both conditions were satisfied here. Motel 6 staff confirmed that Matarese was staying in Room 415. (Doc. 98, H.T. Part I, M. Fada Testimony, 18:8-19:8). In addition, motel surveillance footage confirmed that Matarese remained on the

motel premises and had entered Room 415 prior to his arrest.[3] (Id.) That information provided officers with a reasonable basis to believe that Matarese was residing, albeit temporarily, at the motel and was present there on November 30, 2023. Accordingly, officers were permitted to make an entry into the motel room to execute the arrest warrants.

To the extent defendant argues that officers created their own exigent circumstances by failing to arrest him earlier in the day when he was first observed in the motel parking lot, that argument is unpersuasive. Defendant contends in his reply brief that officers watched him park his vehicle, walk across the parking lot, and enter the motel, yet allowed him to proceed to his room before initiating the arrest. According to defendant, the officers thereby manufactured the very exigency they later relied upon to justify entry into the room. (Doc. 130, Suppl. Br. in Supp. at 4-5). Defendant further argues that, had he already been inside the room when officers arrived on scene, the search would be justified. (Id. at 5).

As the record bears out, Officer Fada believed Matarese was residing at the Motel 6. (Doc. 98, H.T. Part I, M. Fada Testimony, 18:4). According to Fada, he sent Officer Zabrovian into Motel 6 with photographs of defendant to

---

[3] This determination is supported by Officer Fada's testimony, which the court finds credible. (See Doc. 98, H.T. Part I, M. Fada Testimony, 18:8-19:8).

determine whether Matarese was staying there. (Id., 18:8-12).  Officer Fada testified that lodging staff confirmed that Matarese was staying at the motel and provided Officer Zabrovian with his room number. (Id., 18:20-19:1).  Motel staff also confirmed through their surveillance footage that Matarese had recently arrived and remained on the property. (Id., 19:6-22).   Fada then contacted additional police officers for backup. (Id., 20:13-19).

Defendant challenges Fada's account and argues that the officer's testimony was not credible. (Doc. 130, Suppl. Br. in Supp. at 5).  Specifically, defendant points to a report of investigation authored by Task Force Officer John Egan, which stated: "Detectives set up surveillance in the area around the Motel 6, where they observed Matarese arrive at hotel in a black BMW sedan with PA Registration MGW-3434." (Doc. 129-2, Def. Ex. 3, Report ¶ 3).

At best, Matarese has persuaded the court that information was distorted as it was transmitted from officer to officer.  That is, Fada testified that the statement in Officer Egan's report concerning officers setting up surveillance around the motel was inaccurate. (Doc. 98, H.T. Part I, M. Fada Testimony, 36:6).  Specifically, Fada testified that he never told Egan with that officers had established surveillance around the motel before Matarese arrived. (Id., 36:7-18).  Officer Ference further testified that he relayed some information to Officer Egan concerning events that occurred after the arrest, but not events leading up to the

18

arrest. (Id.,100:23-101:2).  Officer Ference also stated that he did not know who supplied Officer Egan with the information reflected in the report regarding the alleged surveillance around the motel. (Id.,101:3-4).

But critically, Officer Fada, Officer Denucci, Officer Ference, and Detective Majikes all testified that Officer Egan was not present at Motel 6 on the day of the arrest. (Id., Officers Testimony, 34:9-10, 56:5-7, 84:3, 106:19-20).  This did not resolve the issue to Matarese's satisfaction.

Over the government's objection, the court scheduled a second hearing date for the direct and cross-examination of Officer Egan. (See Doc. 111, H.T. Part II, 11/03/2025).  Officer Egan confirmed that he was not present on the day of Matarese's arrest. (Id.,10:10-12).  He further testified that he mistakenly stated in the report that officers had set up surveillance around the motel. (Id., 21:13-14).  According to Officer Egan, he drafted the report on December 5, 2023, five days after the arrest. (Id.,14:9-11; Doc. 129-2, Def. Ex. 3, Report at 1).  While reviewing the affidavit of probable cause and the search warrant, both of which reference surveillance video, Officer Egan testified that he mistakenly interpreted those references to mean that officers had conducted surveillance at the motel. (Id., H.T. Part II,12:2-10).

The court finds the testimony of Officer Fada, Officer Denucci, Officer Ference, Detective Majikes, and Officer Egan credible and concludes that law

enforcement officers did not observe Matarese park his vehicle, walk across the parking lot, and enter the motel before initiating the arrest.  Rather, based on the testimony presented at the suppression hearings, the court finds that Matarese was already inside Room 415 when officers arrived at the motel.

Defendant himself acknowledged that, if he was already inside the motel room when officers arrived, the entry into the room would be justified.  The court agrees. [4] See Payton, 445 U.S. at 585–86 ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe [he] is within."); Agnew, 407 F.3d at 196.

---

[4] Even assuming *arguendo* that officers had waited until Matarese entered the motel room before attempting to arrest him, that finding would not alter the court's conclusion.  The Third Circuit Court of Appeals has recognized that "[l]ike our sister circuits, we see no reason to impose a bright line rule limiting protective sweeps to in-home arrests, as we agree with the Colbert court that 'in some circumstances, an arrest taking place just outside a home may pose an equally serious threat to the arresting officers." Sharrar v. Felsing, 128 F.3d 810, 824 (3d Cir. 1997). "Certainly, it would be imprudent to prohibit officers who are effecting an arrest or waiting until a warrant may be obtained from ensuring their safety and minimizing the risk of gunfire or other attack[.]" Id.  Indeed, there are a variety of practical reasons why officers who are attempting to execute valid arrest warrants on an individual with an extensive criminal history may decline to immediately rush an arrest upon a first sighting of the suspect.  Matarese's criminal history includes, among other things, a guilty plea for resisting arrest and escape. (Doc. 128-2, Ex. B, Crim. Record at ECF pp. 7,8).

As the government correctly notes, the motel parking lot presented several tactical concerns not presented inside the motel room.  (Doc. 74, Br. in Opp. at 13 n.6).  The parking lot contained multiple points through which defendant could have fled. Defendant was also near a vehicle that he could have used to evade arrest. (Id.)

Accordingly, officers had legitimate and practical reasons for not immediately attempting to arrest Matarese upon their initial observation.

With respect to entering Room 415, the parties agree that the officers knocked on the door, which defendant eventually opened.  However, immediately upon opening the door and observing the officers, defendant slammed the motel room door shut and latched the lock.  In response to defendant's actions, officers forced entry into the room and completed the arrest.

The government argues that defendant's response to the officers at the door created exigent circumstances. (Doc. 74, Br. in Opp. at 5, 12, 14). Specifically, the government contends that, in light of defendant's extensive criminal history involving controlled substances, including the outstanding warrant related to drug trafficking, officers reasonably believed that defendant was attempting to destroy evidence by flushing narcotics down the toilet. (Id.) According to the government, this sequence of events created exigent circumstances justifying the officers' forced entry into the motel room. (Id. at 14). The court agrees with the government.

"[T]he exigent circumstances exception does not require an officer to have knowledge that evidence is actually being removed or destroyed." United States v. Smith, 224 F. App'x 194, 200 (3d Cir. 2007) (citing United States v. Rubin, 474 F.2d 262, 266 (3d Cir. 1973)). "It is sufficient that the police officers reasonably believed, under the circumstances, that the delay necessary to obtain a warrant would result in the destruction of evidence." Id. (citing Rubin, 474 F.2d at 269)).

21

Here, Officer Fada testified that, based on his training and experience, suspects who abruptly shut a door and attempt to delay apprehension commonly attempt to destroy narcotics by flushing them down the toilet. (Doc. 98, H.T. Part I, M. Fada Testimony, 25:10-16).  This testimony is credible.

Consequently, this credible testimony from Officer Fada supports the exigent circumstances that justified the officers' entry into the motel room. Those exigent circumstances, coupled with the existence of valid arrest warrants for the defendant, establish that the officers did not impermissibly manufacture the exigency in order to enter defendant's motel room.

*The Protective Sweep* – Once inside the motel room, the officers observed defendant standing between the bathroom and bedroom areas. (Doc. 98, H.T. Part I, D. Denucci Testimony, 58:22-59:4).  Officers issued several commands directing Matarese to surrender. (Id., M. Fada Testimony, 23:7-17, 38:17-21). Matarese eventually complied and was placed in handcuffs. (Id.)  Officer Denucci then escorted defendant to the hallway outside the room. (Id., 39:10-14).

Following defendant's arrest, officers conducted a cursory protective sweep of the two-room motel unit, which consisted of a bedroom and bathroom. (Id., 23:5-24:4).  No other individuals were located inside the room. (Id., 24:20-21). During the sweep, however, officers observed in plain view a large quantity of cash on the bedroom nightstand. (Id., J. Majikes Testimony, 108:18-25).  Officers

also observed shards of suspected methamphetamine on the toilet and on the bathroom floor near the toilet, indicating that defendant had attempted to flush methamphetamine down the toilet immediately before officers entered the room. (Id., M. Fada Testimony, 23:12-16). Based on those observations, the officers secured the room while a search warrant was obtained. (Id., 42:4-17).

Defendant contends that officers improperly characterized the search as a "mere cursory sweep". (Doc. 67, Br. in Supp. at 4). According to Matarese, that characterization is misleading because officers remained inside the motel room for at least six minutes, as reflected in the bodycam footage. (Id.) Matarese contends that a protective sweep should last only seconds—namely, only long enough for officers to determine whether the area poses a threat to officer safety. (Id., 5).

A quick and limited warrantless search incident to arrest may nevertheless be reasonable under the Fourth Amendment. Maryland v. Buie, 494 U.S. 325, 334 (1990). Such "protective sweeps" are designed to ensure "that the house in which a suspect is being, or has just been, arrested is not harboring other [dangerous individuals] who could unexpectedly launch an attack." Id. at 333. The United States Supreme Court has recognized that "[t]he risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter." Id. at 333. "[U]nlike an encounter

on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' " Id. "An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." Id.  Accordingly, protective sweeps are limited to a "cursory visual inspection of those places in which a person might be hiding." Id. at 327.

Here, officers conducted that protective sweep incident to Matarese's arrest.  Officer Fada testified that the sweep itself lasted only seconds. (Doc. 98, H.T. Part I, M. Fada Testimony, 42:4-15).  Under these circumstances, "a [search] warrant was not required . . . [and]  as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Buie, 494 U.S. at 334.  The protective sweep conducted here therefore passes constitutional muster.

*After the Protective Sweep* – After conducting the protective sweep, which revealed a large amount of cash in the bedroom and shards of suspected methamphetamine on and around the toilet, officers secured the motel room while a search warrant was obtained. (Doc. 98, H.T. Part I, M. Fada and J. Majikes Testimony, 23:12-16, 43:5-9, 108:18-25).

Matarese argues that the officers' lawful authority to remain inside the motel room expired the moment the protective sweep concluded.  In the abstract, defendant is correct. Buie, 494 U.S. at 335–36 ("The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and... to complete the arrest and depart the premises.").  Here, however, Officer Fada testified that he remained in the motel room for approximately five to ten minutes after the brief protective sweep solely to secure the room while Detective Majikes sought the search warrants. (Doc. 98, H.T. Part I, M. Fada Testimony, 42:10-17, 48:11-21). Detective Majikes likewise testified that he instructed the remaining officers at the motel room to maintain the security of the room pending issuance of the warrants so that officers could later conduct a full evidentiary search. (Id., J. Majikes Testimony, 112:12-19).

The credible testimony presented at the suppression hearing establishes that officers remained inside the motel room, not to continue searching it, but merely to secure it while awaiting the warrants.  Common sense supports such testimony.  That is, from the bodycam video, Matarese was arrested in a budget motel room in the interior of a building with narrow hallways.  Even after Detective Majikes left the premises, at least six members of federal, state, and local law enforcement remained in tight quarters.  It is logical for some officers to have remained in the room while the defendant was in the hallway.  And, as

25

discussed in further detail below, their time in the room was extended when Matarese began communicating with Trooper Denucci and then Officer Ference.

Even assuming the officers' decision to secure the room from the inside exceeded the permissible scope of the protective sweep, suppression would provide little deterrent benefit under the circumstances presented here, which implicate the inevitable discovery doctrine. As explained:

> The key question under the inevitable discovery doctrine is whether "the Government has shown by a preponderance of the evidence that routine police procedures inevitably would have led to the discovered" evidence. [United States v. Stabile, 633 F.3d 219, 245 (3d Cir. 2011)]. Our focus is on "historical facts capable of ready verification, and not speculation." Id. at 246 (quoting United States v. Vasquez De Reyes, 149 F.3d 192, 195 (3d Cir. 1998)). Decisions from our sister circuits have looked to two factors that we agree are most salient here: the likelihood of a warrant issuing, and how far into the application process the government was when its pursuit of a warrant was cut off. See, e.g., United States v. Hughes, 640 F.3d 428, 440 (1st Cir. 2011) ("The troopers had support staff on stand-by, ready to apply for a warrant, and the warrant issued the next day. That was sufficient for the inevitable discovery doctrine to take hold[.]"); United States v. Are, 590 F.3d 499, 507 (7th Cir. 2009) ("[I]t is reasonable to conclude that the officers would have sought a warrant to search the bedroom and, once they had, it is virtually certain that a warrant would have been issued."); United States v. Lamas, 930 F.2d 1099, 1103 (5th Cir. 1991) (finding it relevant that, "at the time of the warrantless search, the officers had begun actively to pursue a warrant").

United States v. Alexander, 54 F.4th 162, 174 (3d Cir. 2022).

26

Detective Majikes testified that he sought search warrants for both the motel room and defendant's car.[5] (Doc. 98, H.T. Part I, J. Majikes Testimony, 110:7-15). Detective Majikes also testified that it took several hours to obtain judicial approval of those warrants. (Id., 112:9-11). The officers entered the motel room at approximately 10:20 a.m. and the warrants were issued around 1:30 p.m., a three-hour process. (Id.,112:2-3; see also Doc. 74, Br. in Opp. at 5).

Once the warrants were issued, officers searched the motel room, and per the government, they recovered "235 grams of methamphetamine, a loaded Taurus 9mm semi-automatic pistol, S/N 1GAS0731, a box containing 46 rounds of pistol ammunition, $1223, a small amount of marihuana, methamphetamine residue, a Connecticut ID with the name of Kevin Naulty, a cellular phone, and a digital scale." (Doc. 74, Br. in Opp. at 9–10). However, according to the government, "nothing of evidentiary value was recovered from the BMW." (Id.)

On this record, the court concludes that the contraband would have inevitably been discovered regardless of whether the officers secured the motel room from inside the room or from the hallway while awaiting the warrant. Nix v. Williams, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a

---

[5] Detective Majikes sought search warrants for both the motel room and defendant's vehicle based on his observations inside the motel room and his belief, grounded in his training and experience, that additional contraband or evidence might be located inside the vehicle. (Doc. 98, H.T. Part I, J. Majikes Testimony, 110:14-15).

preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received."); see also Stabile, 633 F.3d at 246 ("[T]he very fact that the Government attempted to secure state and federal search warrants at every step of the search indicates that there would be little deterrence benefit in punishing the Government."). Accordingly, the evidence recovered from Matarese's motel room will not be suppressed.

### 2. Whether Officers Complied with Miranda

Defendant also seeks to suppress any oral statements he made while handcuffed and seated on the floor in the hallway outside his motel room. (Doc. 67, Br. in Supp at 3). Matarese argues that these statements were obtained while he was in custody and subjected to questioning without first being advised of his rights under Miranda. (Doc. 92, Reply Br. at 5). According to defendant, the allegedly inculpatory statements were later used to establish probable cause for the issuance of the search warrant for his motel room.

The prerequisite for the application of Miranda safeguards is the concurrence of two factors: "in custody" and "interrogation." United States v. Dupree, 617 F.3d 724, 731 n. 7 (3d Cir. 2010). "In determining whether an individual is in custody, the ultimate inquiry is: 'whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'

" Leese, 176 F.3d at 743 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983); Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).  The government does not dispute that Matarese was in custody at the time he made the incriminating statements.[6]

Once in custody, "the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Innis, 446 U.S. at 300-01. The "functional equivalent" of interrogation includes "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301.

The "functional equivalent" definition "focuses primarily upon the perceptions of the suspect, rather than the intent of the police," reflecting that "the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." Id.  "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." Id.  Accordingly, "[c]oercion is [also]

---

[6] In his sworn affidavit for a search warrant, Detective Majikes noted that "Matarese was taken into custody upon arrest" and that "[o]nce in custody, Matarese was read his Miranda rights." (Doc. 74-2, Gov. Ex. 4, Warrant App. at 4).

determined from the perspective of the suspect." Illinois v. Perkins, 496 U.S. 292, 296 (1990) (citing Innis, 446 U.S. at 301)).

Pursuant to Innis, "not ... all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation." 446 U.S. at 299–300.  The functional equivalent of interrogation does not include any words or actions on the part of the police that are "normally attendant to arrest and custody[.]" Id. at 300–01.  Additionally, the "police may not ... be held accountable for the unforeseeable results of their words or actions." United States v. Brownlee, 454 F.3d 131, 146 (3d Cir. 2006) (quoting Innis, 446 U.S. at 302)) (cleaned up).  To constitute an interrogation, officer conduct "must reflect a measure of compulsion above and beyond that inherent in custody itself." Innis, 446 U.S. at 300.  Moreover, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." Miranda, 384 U.S. at 478.

Applying the foregoing standard, the court carefully reviewed Officer Ference's bodycam footage and the suppression hearing transcripts to determine whether the officers' words or actions were those that are normally attendant to arrest and custody, whether the officers sought to capitalize on the nature of the arrest, and whether they should have been aware of any particular susceptibilities on the part of the defendant.

*Whether Matarese was Mirandized* – After his arrest, defendant was handcuffed and seated on the floor in the hallway outside his motel room. According to the government, Matarese, without being questioned, voluntarily informed Officer Denucci that there was a firearm in the room. (Doc. 74, Br. in Opp. at 7). The government further contends that, immediately after defendant made that statement, Officer Denucci provided defendant with Miranda warnings. (Id.) Defendant, by contrast, maintains that he was never Mirandized. (Doc. 92, Reply Br. at 5; Doc. 130, Suppl. Br. in Supp. at 9).

Credible officer testimony supports the government's account. Specifically, Officer Denucci credibly testified that he advised Matarese of his Miranda rights after defendant stated that there was a gun inside the room. (Id., D. Denucci Testimony, 66:5-7, 69:25-70:1-15, 75:21-23). During the suppression hearing, Officer Denucci identified himself in the bodycam footage, which although lacking audio, depicts him speaking with Officer Ference immediately after the exchange with Matarese. (Id., 66:5-20). According to Denucci, Matarese asked whether there was someone present with whom he could speak and indicated that there was a firearm inside the motel room. (Id., 70:4-16). Officer Denucci testified that he then advised Matarese of his Miranda rights and informed him that another officer, who more regularly handled investigations of that nature, could speak with him. (Id.) Officer Denucci further testified that he relayed this information to

Officer Ference. (Id., 75:2-6). Officer Ference likewise confirmed Officer Denucci's recollection of the events. [7] (Id., J. Ference Testimony, 87:1-16; 90:7-12).

Based on the foregoing, the court concludes that Matarese was Mirandized before any custodial interrogation occurred.

*Pre-Miranda Statement* – Before Matarese received his Miranda warnings, he made a statement indicating that there was a firearm inside the motel room. That statement was not captured on the bodycam footage. Defendant maintains that he made no spontaneous statements and that any statements attributed to him were elicited while he was subjected to questioning without Miranda warnings. (Doc. 92, Reply Br. at 5). The government disagrees and contends that the defendant voluntarily made this statement regarding the firearm without prompting or interrogation. (Doc. 74, Br. in Opp. at 7). Similarly, after

---

[7] Officer Denucci testified that he had no control over whether the audio function on the bodycam was activated. (Doc. 98, H.T. Part I, D. Denucci Testimony, 75-9:10). He further testified that he was not equipped with a body camera on the day of the arrest. (Id., 75:12-13).

Based on the record, Ference was the only one present at the scene who was equipped with an active bodycam. (Id., M. Fada Testimony, 6:10-12, 22:11-13).

According to Officer Fada, the officers neither had a choice nor discretion regarding the use of bodycams. (Id., 22:11-13). Fada further testified that aside from Ference, the remaining officers were not equipped with bodycams because neither the United States Marshals Service nor their respective home agencies issued them bodycams. (Id.)

consideration of the officers' testimony in this case, which was credible, the court agrees with the government's position.

When the United States Supreme Court imposed the requirement of warnings in Miranda, it was concerned with "a variety of psychological ploys." Arizona v. Mauro, 481 U.S. 520, 526 (1987) (quoting Miranda, 384 U.S. at 450; Innis, 446 U.S. at 299)). Those ploys involved positing the guilt of the subject, minimizing the moral seriousness of the offense, and casting blame on the victim or on society. Id.  When "coupled with the interrogation environment," the Supreme Court determined that such ploys were "likely to subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination." Id.  However, "subtle compulsion" is not interrogation requiring Miranda warnings. Id. at 528–29 (citing Innis, 446 U.S. at 303)).  Furthermore, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within Miranda's concerns." Perkins, 496 U.S. at 297 (citations omitted).

Here, Officer Denucci's version of events was corroborated by Officer Ference, whose testimony the court also finds credible.  Beyond challenging the officers' credibility, defendant advances no evidence demonstrating that the statement was the product of interrogation or its functional equivalent.  Nothing in the record suggests that Officer Denucci's words or conduct were designed to

33

elicit an incriminating response from Matarese. Indeed, the bodycam footage reflects that after Officer Denucci alerted Officer Ference, Officer Ference approached defendant in the hallway in a calm manner and stated "so you had said to other officers that there is a firearm in the room, is that correct?" (Doc. 75, Ex. B., Ference BWC, 1:00-1:08). Matarese responded by nodding affirmatively. (Id.)

Based on the totality of circumstances, the court concludes that Officer Denucci's conduct after the defendant's arrest consisted of routine measures related to officer safety and scene control, rather than custodial interrogation designed to obtain testimonial evidence. See Muniz, 496 U.S. at 603 (holding that officer instructions "were not likely to be perceived as calling for any verbal response and therefore were not 'words or actions' constituting custodial interrogation").

Therefore, defendant's statement regarding the gun was voluntary and will not be suppressed.

*Post-Miranda Statements* – Matarese's post-Miranda statements to Officer Ference were captured on the bodycam footage. As reflected in the video, Officer Ference asked Matarese where the firearm was located. (Doc. 75, Ex. B., Ference BWC, 1:08-1:11). Matarese responded, "in the black bag." (Id.,1:11-0:01:12). Officer Ference then asked what else officers would find in the room.

(Id., 1:12-1:16).   Matarese replied, "just a little bit of weed and my money." (Id., 1:16-1:19).

Officer Ference then informed Matarese that officers were in the process of obtaining a search warrant and advised him that anything recovered from the room would be attributed to him. (Id., 1:25-1:37).  Officer Ference further explained that, if defendant was being dishonest, any opportunity for cooperation would be lost. (Id., 1:37-1:45).  Matarese responded that he wanted to help the officers. (Id., 1:46-1:48).  Officer Ference then asked the defendant what officers were going to find in the room. (Id., 1:55-2:17).  At that point, defendant became emotional, began crying, and lowered himself onto the floor. (Id.)  After Officer Ference helped defendant sit back up, Ference reiterated that he was seeking Matarese's cooperation, if defendant was willing to provide it. (Id., 2:20-3:40).

Matarese then asked if the bodycam was recording, to which Officer Ference responded affirmatively. (Id., 3:45-3:50).  Matarese replied "fuck me" (or "fuck man") and asked whether there was anything he could do to help himself. (Id., 3:55-03:59).  Officer Ference repeatedly told defendant that he needed him to be truthful and that dishonesty would prevent officers from helping him. (Id., 4:24-5:12).  When Officer Ference indicated that defendant would otherwise face the full extent of the charges, defendant appeared to reconsider his position. (Id., 4:24-5:36).   Matarese then stated that there "is weed and ice in there" and

35

admitted, "I get high." (Id., 4:57-6:01). Matarese ultimately clarified that he had bought approximately five ounces of "ice" the night before. (Id., 6:01-6:10). Officers thereafter took him into the elevator.

A finding of involuntariness requires coercive police activity. United States v. Jacobs, 431 F.3d 99, 108 (3d Cir. 2005) (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).  In determining whether officers engaged in a coercive activity, the Third Circuit Court of Appeals considers the following factors:

> [T]he officers' tactics, including "the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep." Halsey v. Pfeiffer, 750 F.3d 273, 303 (3d Cir. 2014) (quoting Miller v. Fenton, 796 F.2d 598, 604 (3d Cir. 1986)). We also consider the defendant's characteristics, including his "youth ... ; his lack of education or his low intelligence; the lack of any advice ... of his constitutional rights," id. (quoting Miller, 796 F.2d at 604), and his "background and experience, including prior dealings with the criminal justice system," Jacobs, 431 F.3d at 108. All these factors assist in answering "the ultimate question[:] ... 'whether the defendant's will was overborne when he confessed.' " Halsey, 750 F.3d at 304 (quoting Miller, 796 F.2d at 604).

United States v. Ludwikowski, 944 F.3d 123, 135 (3d Cir. 2019).

Because defendant properly received his Miranda warnings, the remaining issue is whether his statements to Officer Ference were voluntary.  Applying the factors identified in Ludwikowski, the court concludes that they were. The interaction lasted only a matter of minutes and occurred in the hallway outside the motel room where defendant had been staying, rather than in a police station

36

or interrogation room. The detention was brief and the questioning was neither repeated nor prolonged. Instead, the interaction consisted of a short exchange that occurred within minutes after Matarese's arrest. Nothing in the record suggests that Matarese was deprived of food, water, sleep, or other basic necessities. In addition, the defendant's extensive criminal history reflects familiarity with the criminal justice system.

The bodycam footage further demonstrates that defendant's statements were the product of his own free will. During the interaction with Officer Ference, defendant voluntarily admitted to the presence of narcotics and a firearm inside the motel room in the apparent hope that this cooperation would later be viewed favorably by law enforcement or prosecutors. The court finds that this was a rational and free choice made by Matarese after being properly advised of his constitutional rights.

Accordingly, Matarese's post-<u>Miranda</u> statements to Officer Ference in the motel hallway were voluntary and will not be suppressed.

### 3. Whether the Search Warrant Was Supported by Probable Cause

Matarese advances several arguments, addressed below, in support of his contention that the search warrants obtained by Detective Majikes failed to establish probable cause. None of those arguments are persuasive.

"To find probable cause to search, there needs to be a 'fair probability that contraband or evidence of a crime will be found in a particular place.' " United States v. Burton, 288 F.3d 91, 103 (3d Cir. 2002) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  Probable cause is a "fluid concept" that is fact-specific and "not readily, or even usefully, reduced to a neat set of legal rules." United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993) (quoting Gates, 462 U.S. at 232)).

Where, as here, a defendant challenges a state magisterial district judge's determination of probable cause, the reviewing court's inquiry is limited to whether "the magistrate judge [or state court judge] had a substantial basis for concluding that probable cause existed." Id. at 1055; see Gates, 462 U.S. at 236. The court's task here "is not to decide probable cause de novo, but to determine whether 'the magistrate [or state court judge] had a substantial basis for concluding that probable cause existed.' " United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Gates, 462 U.S. at 238)).  In making that determination, the reviewing court must defer to the fact that "[i]t is distinctly the magistrate's task to make the 'practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular

place.' " United States v. Williams, 974 F.3d 320, 350–51 (3d Cir.

2020) (quoting Gates, 462 U.S. at 238)).

Accordingly, "[i]f a substantial basis exists to support . . . [a] probable

cause finding, [the reviewing court] must uphold that finding even if a 'different . .

. judge might have found the affidavit insufficient to support a warrant.'"[8] Stearn,

597 F.3d at 554 (quoting Conley, 4 F.3d at 1205)).

Here, Detective Majikes's affidavit of probable cause stated, inter alia, that:

> At approx. 10:20 A.M. officers approached the door to room 415 and knocked and used a ruse. After a couple of minutes, a W/N/M [white, non-Hispanic, male] positively identified as Adam Matarese opened the door to room 415. Matarese immediately slammed the door and latched it once he saw it was the police. Officers then forced the door open and observed Matarese standing between the bedroom and bathroom. Matarese was given several commands to surrender which he at first ignored. Eventually Matarese surrendered and was taken into custody.
>
> During a cursory sweep of the motel room, a large amount of U.S. currency and a cellular telephone was observed in plain sight on the nightstand in the bedroom. On the toilet seat and bathroom floor was shards of suspected Crystal Methamphetamine.

---

[8] In conducting that review, the court must consider the affidavit as a whole, interpreting it "in a commonsense and nontechnical manner." United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (citing United States v. Conley, 4 F.3d 1200, 1206 (3d Cir. 1993)). "In making this determination, the Court confines itself 'to the facts that were before the magistrate judge [or state court judge], i.e., the affidavit, and does not consider information from other portions of the record.' " United States v. Hodge, 246 F.3d 301, 305 (3d Cir. 2001) (quoting Jones, 994 F.2d at 1055)).

39

> Once in custody, Matarese was read his Miranda Warnings on video and he agreed to speak with officers. Matarese, on video admitted to having at least Five (5) ounces of crystal methamphetamine in the room along with a firearm, money, and cell phone.

(Doc. 74-2, Warrant App. at 4) (paragraph numbers removed).

Matarese nevertheless argues that the evidence recovered pursuant to the warrant must be suppressed because the affidavit failed to establish probable cause. Specifically, Matarese contends that: 1) the affidavit falsely represented that defendant was Mirandized before making incriminating statements; 2) his statement regarding the firearm in the room was obtained in violation of Miranda; 3) the officers' testimony that they observed suspected methamphetamine in the bathroom is not supported by the record; and 4) Officer Fada's description of the suspected material in the bathroom as glass-like shards was insufficient to establish probable cause. (Doc. 67, Br. in Supp at 3; Doc. 130, Suppl Br. at 9, 10).

Matarese's Miranda-related arguments have been already discussed and rejected. Therefore, the court need not address them here.

Defendant next argues that the bathroom door had already been secured and closed following the protective sweep. (Doc. 130, Suppl. Br. in Supp. at 9). According to defendant, Officer Fada closed the bathroom door so that other

40

officers could move through the motel room. (Id.)  The bodycam footage supports that account. [9] (Id.)

Matarese contends that any reopening of the bathroom door before the warrant issued would have exceeded the permissible scope of the protective sweep and constituted an unlawful additional search.

The testimony at the suppression hearing, however, does not support defendant's characterization of events.  Officer Fada testified that he closed the bathroom door after clearing the bathroom simply to create space for officers moving through the narrow motel room while checking for additional threats. (Doc. 98, H.T. Part I, M. Fada Testimony, 43:13-44:7).

Officer Denucci likewise testified that he did not enter or inspect the bathroom after arriving in the room. (Id., D. Denucci Testimony, 60:1-3).  The bodycam footage further reflects that the bathroom door remained closed while

---

[9] The government contends that the only factual inaccuracy contained in the warrant application was the statement that defendant was read his Miranda warnings on video. (Doc. 74, Br. in Opp. at 17).  According to the government, Officer Denucci, did in fact advise Matarese of his Miranda rights, but that was not captured on the bodycam footage. (Id. at 17-18).

This factual inaccuracy is not material to the determination of whether probable cause existed to believe that the motel room contained a controlled substance or evidence related to the manufacture or distribution of a controlled substance.  Additionally, Detective Majikes' affidavit of probable cause contained ample additional information independently supporting the issuance of the warrant. See United States v. Johnson, 690 F.2d 60, 63 (3d Cir. 1982) ("It is settled law in this court that, even assuming that some factual averments in the affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit.").

Officer Ference was in the room. (Doc. 75, Ex. B., Ference BWC, 0:00:01-0:00:32).

Defendant also argues that, if the bathroom door was reopened, the observations made by the officers after the bathroom had been secured could not properly support probable cause. (Doc. 130, Suppl. Br. in Supp. at 9). But that argument is unsupported by the record. The court therefore credits and considers the officers' testimony regarding their observations inside the motel room.

Furthermore, defendant also contends that Officer Fada's testimony regarding the suspected methamphetamine in the bathroom—that just appeared to be shards of glass—was insufficient to establish probable cause. (Doc. 130, Suppl. Br. in Supp. at 10). This argument mischaracterizes the testimony presented at the hearing.

Officer Fada testified that he observed on the toilet seat "[g]lassine shards or crystal-like material, which [he] believed to be methamphetamine" based on his training and extensive experience investigating drugs offenses. (Doc. 98, H.T. Part I, M. Fada Testimony, 14:22-25, 25:2-9, 44:11-45:2). According to Fada, the crystal-like material was plainly visible on top of the toilet and around the bathroom floor. (Id.) Officer Fada further testified that based on his experience,

suspects commonly attempt to flush narcotics down the toilet after delaying officers at the door. (Id., 25:14-16).

Detective Majikes, who later prepared the affidavit of probable cause, also testified that he participated in the protective sweep and observed a plastic bag and shards scattered across the toilet seat and floor near the toilet. (Id., J. Majikes Testimony, 108:7-10). Based on his experience, Detective Majikes believed the material to be methamphetamine.[10] (Id., 108:11-16).

Taken together, those observations provided ample ground for the issuing judge to conclude that there was a fair probability that controlled substances or other contraband would be found inside the motel room. Magisterial District Court Judge Thomas F. Malloy made a practical, commonsense determination that probable cause existed, and the affidavit provided substantial basis for that conclusion. Like Matarese's other suppression arguments, his challenge to probable cause falls short. This motion to suppress will be denied.

---

[10] It was also permissible for Detective Majikes to rely on his plain-view observations in support of the application for a warrant to search the motel room. See United States v. Stabile, 633 F.3d 219, 241 n.17 (3d Cir. 2011) ("[A]n officer's mere observation of an item left in plain view ... generally involves no Fourth Amendment search.... The information obtained as a result of observation of an object in plain sight may be the basis for probable cause or reasonable suspicion of illegal activity.") (quoting Texas v. Brown, 460 U.S. 730, 738 n.4 (1983) (plurality opinion).

**Conclusion**

For the reasons set forth above, Matarese's motion to suppress, (Doc. 66), will be denied. An appropriate order follows.  By way of separate order, this matter will be listed for trial.

Date: 6/3/26

JUDGE JULIA K. MUNLEY
United States District Court

44